UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

DAVID EARL ROACH,         )
         )
*Plaintiff*,         )
         )    Case No. 4:11-cv-74
v.         )
         )    Judge Mattice
SANFORD, L.P., and NEWELL         )
RUBBERMAID, INC.,         )
         )
*Defendants*.         )
         )

## MEMORANDUM & ORDER

Before the Court are Defendants' Motion for Summary Judgment (Doc. 12), Plaintiff's "Motion for Leave to Respond to Defendants' Reply to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment," (Doc. 17), and the parties' "Joint Motion to Continue Trial Date and Pretrial Deadlines" (Doc. 20). Plaintiff's Motion for Leave to Respond (Doc. 17) will be **DENIED**.[1] The Court has considered Defendants' Motion for Summary Judgment, as well as Plaintiff's Response (Doc. 14) and Defendants' Reply (Doc. 16), as well as the accompanying evidence. For the reasons discussed herein, the Court will **GRANT** Defendants' Motion for Summary Judgment (Doc. 12). The parties' Joint Motion to Continue Trial (Doc. 20) will accordingly be **DENIED AS MOOT**.

---

[1] Plaintiff requests leave to respond to Defendants' Reply in order to rebut their assertion that Plaintiff's Response to Defendants' Motion for Summary Judgment was untimely. (*See* Doc. 17). However, the Court finds that Plaintiff's Response is unnecessary, as the Court will accept Plaintiff's Response in Opposition to Summary Judgment as timely.

## I. BACKGROUND

For the purposes of summary judgment, the Court will view the facts in the light most favorable to Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Plaintiff Roach began working for Defendants as a temporary worker in the maintenance department. (Doc. 15-1 at 2-4). In August 2010, Plaintiff applied for a full-time position that became available, and, in October 2010, Plaintiff began working for Defendants in the full-time position of order processor. (*Id.*). Plaintiff's responsibilities included riding a forklift around the facility to pull and palletize product orders for customers. (*Id.* at 4).

When he began his full-time employment with Defendants, Plaintiff received an employee handbook ("the Handbook") as well as a "thorough" explanation of the policies and procedures therein from a member of the human resources team.[2] (*Id.* at 5-6, 39-40). The Handbook contains a detailed attendance policy, specifying that Defendants utilize "an attendance occurrence system" wherein employees accrue half a point for a partial absence – that is, when less than half of the employee's shift is missed – and a full point for each day missed. (Doc. 15-2 at 114-15). The Handbook provides that employees will not be assessed attendance occurrence points for, *inter alia*, "[p]aid vacation time requested and approved," "[a]pproved leaves of absence," "[a]uthorized lost time due to a reported work-related injury," or "sick days." (*Id.* at 114-15). Employees are cautioned that they must "closely monitor" their attendance occurrence levels. (*Id.*).

[2] On July 14, 2011, Plaintiff acknowledged that he had received an updated copy of the Handbook, which contained identical attendance policies as the original Handbook that Plaintiff received when he commenced his employment. (*See* Doc. 15-1 at 38).

The Handbook further states that:

> If you have medical documentation excusing you from work . . . for 2 or more consecutive, calendar days (up to 7 consecutive calendar days), upon approval from Human Resources, only one occurrence will be assessed.

> An associate who is out sick 3 or more consecutive work days will be required to provide a note from a medical provider . . . .

> All medical documentation must be provided directly to the Human Resources Department and must have adequate information regarding the absence(s). The Company reserves the right to refuse any medical documentation that does not contain adequate information about the absence(s).

(*Id.* at 115). According to Human Resources Generalist Jennifer Camilletti, "acceptable" medical documentation must "be from a medical care professional stating that the employee had been seen by that medical care professional and that they were excused from whatever the date range is . . . in essence, they're stating that this person is unable to work." (*Id.* at 6-7, 9; Doc. 13-6 at 1). Although Camilletti conceded that the Handbook is not "specific" as to what medical documentation is required, she confirmed that all employees are made aware of the policy and the fact that a "sick note" must be provided. (Doc. 15-2 at 9). Plaintiff disputes that he was advised of these specific requirements at his orientation. (Doc. 15-10 at 1).[3]

The Handbook states that all employees "are hired on an at-will basis." (Doc. 15-2 at 106). The Handbook provides for a "progressive discipline" scheme "when . . . deemed to be appropriate by the Company." (*Id.* at 108). Under the progressive discipline scheme, employees may be given a first, second, and final corrective action

---

[3] In his declaration, Plaintiff asserts that "[t]he requirements of proper medical documentation for the purpose of excusing absences was never explained to me during orientation nor was it contained in either handbook that I was given while I worked at Sanford." (Doc. 15-10 at 1). However, at a minimum, the employee Handbook, which Plaintiff concedes that he received, contained medical documentation requirements and indicated that any documentation may be rejected for lack of adequate information. (*See* Doc. 15-2 at 114-16; Doc. 15-1 at 5-6, 39-40).

notice before being terminated for violations of Defendants' policies and procedures. (*Id.*). Employees "may" receive progressive action regarding violations of the attendance occurrence system as follows: (1) four attendance occurrence points may results in a first corrective action; (2) six attendance occurrence points may result in a second corrective action; (3) seven attendance occurrence points may result in final corrective action; and (4) eight attendance occurrence points may results in termination. (*Id.* at 115). The purpose of the progressive discipline policy is "to give the employees warning," "coach them," and "[g]et them back on track." (Doc. 15-3 at 28). However, according to Camilletti, the handbook provides that Defendants "are at liberty to skip steps depending on the severity of the incident. . . . if we need to." (Doc. 15-2 at 11). Indeed, the Handbook states that "[d]epending on the circumstances of each individual case, the discipline warranted may be up to and including discharge, which may occur on the first offense," and that "[t]he Company reserves the right to skip steps in the progressive disciplinary process depending on the severity of the conduct or where the associate displays a lack of effort in correcting a problem or complying with Company rules." (*Id.* at 106, 115).

The Handbook also provides that Defendants' reserve the right "to make changes at any time to provisions in this Handbook." (*Id.* at 106). Camilletti stated that Defendants' policies are applied "as consistent as we possibly can. . . . [T]hey are rigid because we do apply the policy consistently to all of the employees we see." (*Id.* at 10). Camilletti noted, however, that, "if we're gonna err on the side of anything, if we're gonna be flexible, it's gonna be to help the employee, not the other way around. . . . [W]e want to be able to err on the side of assisting our employees." (*Id.*).

Plaintiff left work early on January 24, 2011 because he was sick. (Doc. 15-2 at 136). On February 3, 2011, Plaintiff's supervisor, Tyson Alexander, completed a progress report for Plaintiff, rating him as "effectively meets standards" in most categories, including attendance. (Doc. 15-6 at 4-8).

While Plaintiff was working on February 16, 2011, he picked up "a box that was rather bulky and . . . weight[y]," and then "felt something . . . like someone hit me in the stomach." (Doc. 13-1 at 6). Plaintiff "eased" the box down and then "kind of fell on top of it." (*Id.*). After he stretched, "the pain wasn't there anymore," so Plaintiff assumed that the feeling "was some kind of warning sign." (*Id.*). Plaintiff continued to work, despite the fact that his abdomen was "sore to the touch," but later reported the incident to Alexander. (*Id.* at 7; Doc. 15-1 at 12). Alexander was concerned and told Plaintiff that an incident report would be prepared, but he did not advise Plaintiff to visit Defendants' on-site clinic.[4] (Doc. 15-1 at 10-12).

The next morning, Plaintiff noticed a "bulge" on the left side of his abdomen. (*Id.* at 12). When he got to work that day, he went to the clinic and saw a nurse practitioner named David Hubbard. (*Id.* at 13). Hubbard "poked at [the bulge] a little bit," told Plaintiff that his "best guess [wa]s it's a strain," and advised Plaintiff that he wanted to look at the bulge again a few days later. (*Id.*at 13-14). In his handwritten notes for the visit, Hubbard indicated that Plaintiff had a "poss[ible] "abd[ominal] hernia." (*Id.* at 43). Plaintiff, however, was "never ever told it was a hernia[.]" (*Id.* at 32). Plaintiff was

---

[4] It is undisputed that Sanford has on-site nurse practitioners to provide medical care to Defendants' employees and their families. (*See* Doc. 15-3 at 13). Plaintiff believed that the nurse practitioners were employed by Sanford; however, the nurse practitioner's were actually affiliated with a Vanderbilt Clinic. (Doc. 15-10 at 1). If an employee is injured on the job, he is instructed to visit the on-site clinic first "in the event that [he] can get immediate assistance from them there." (Doc. 15-3 at 16). If no nurse practitioner is available, employees may be instructed to go to the emergency room or come back when a nurse practitioner is available, depending on the severity of the injury. (*Id.*). Defendants' do not have direct access to the medical records kept by these nurse practitioners. (*Id.* at 15)

cleared for work and was able to work that day with no restrictions.  (*Id.* at 14; Doc. 13-1 at 54).

On the morning of February 21, 2011, Plaintiff visited Hubbard again regarding the abdominal bulge.  (Doc. 15-8 at 3).  Hubbard sent the following email to Human Resources Manager, Stephanie Ward:

> [The mass] is markedly improved and [Plaintiff] is not having any pain or restriction of movement.  I believe he will be OK to continue working without restrictions.  I did discuss with him the importance of good body mechanics and will follow up on an as needed basis.  I am not entirely sure this is even related to the event that occurred Wednesday night.

(*Id.*; *see* Doc. 15-2 at 12).

According to Plaintiff, his condition then "got progressively worse."  (Doc. 15-1 at 14).  Plaintiff called in sick to work on February 28, 2011.  (Doc. 15-2 at 136).  On March 15, 2011, Plaintiff again visited the on-site clinic and was seen by a nurse practitioner named "Caroline."  (*See* Doc. 15-1 at 44).  The nurse practitioner's notes indicate that Plaintiff's abdominal mass was "improving"; specifically, the nurse noted that the mass was "elevated, superficial, [and] non-tender" and that Plaintiff did not report any pain.  (*Id.*).  The nurse's notes indicated that Plaintiff was advised to "report any changes or pain" and to follow-up "in 2-4 week[s], unless any changes in pain / bowels / size" and that Plaintiff verbalized his understanding of these instructions.[5]  (Doc. 15-1 at 44).  Plaintiff was not told at this visit that he may have a hernia.[6]  (*Id.* at 32).

---

[5] At her deposition, a different nurse practitioner, Dianne Clark testified that these instructions regarding changes in bowel patterns may have given because "[i]f the gut becomes trapped . . . [the bowels] can become obstructed, leading to constipation or "vomit[ing] stool."  (*See* Doc. 15-4 at 2).

[6] In his Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiff states that "N[urse Practitioner] Caroline's medical notes also indicate that [Plaintiff] had a hernia."  (Doc. 15 at 4).  It appears that the nurse practitioner's notes do contain the word hernia; however, the Court cannot decipher all of the handwritten words on the form, and therefore cannot determine the context in which the nurse practitioner used the word.  (*See* Doc. 15-1 at 44).

On April 4, 2011, Plaintiff again visited the on-site clinic, where he was seen by a different nurse practitioner, Dianne Clark. (*Id.* at 45). Clark's notes indicate that Plaintiff reported feeling "constipated" and "weak," but he did not report any abdominal pain. (*Id.*). Plaintiff was advised to take stool softeners, increase fluids, and monitor his blood pressure. (*Id.*). Clark's notes do not indicate that Plaintiff complained about his abdominal bulge at this visit, nor do they make any reference to the bulge. (*See id.*). Clark has conceded that, at the time she examined Plaintiff, she was "out of th[e] loop" with regards to the possibility that he had a hernia and that she treated him only for his complaint at that visit – that is, constipation. (Doc. 15-4 at 4).

Sometime around April 7 or 10, 2011, Plaintiff's abdominal bulge "started to hurt without touching it" on an intermittent basis. (Doc. 15-1 at 16). Plaintiff stated that he "kept doing his best" to work throughout the month of April, but in late April, he "hit a threshold point where it hurt constantly." (*Id.*). Plaintiff's pain caused him to leave work early on April 19, 2011. (*Id.* at 16-17). Because no nurse practitioner was on duty when Plaintiff left work early that day, he came to talk to Clark the following day about his "unbearable" pain. (*Id.* at 17). Because of Plaintiff's constipation issues, Clark referred Plaintiff to Dr. Ronald Angles, a gastroenterologist because "[s]he thought it was the bowel thing[.]" (*Id.* at 17-18, 47; Doc. 13-1 at 32).

From April 19 through April 26, 2011, Plaintiff did not return to work, and instead called into the employee hotline on a daily basis. (*See* Doc. 15-7 at 1). On April 26, 2011, Plaintiff visited Dr. Angles, who diagnosed Plaintiff with a hernia, advised Plaintiff that hernias "can be very dangerous," and recommended that he schedule an appointment with a surgeon as soon as possible. (Doc. 15-1 at 19, 47). Plaintiff called Clark after his appointment with Dr. Angles and told her that he was being advised to go

to a surgeon; Plaintiff also called into the employee "hotline" for sicknesses to leave "a brief message of what was going on." (*Id.* at 20).

Plaintiff did not return to work after April 26, 2011, and instead continued to call into the employee hotline on a daily basis.[7] (*See* Doc. 15-7 at 1). On May 2, 2011, Plaintiff visited Dr. Navid Monajjem at the Shelbyville Surgical Clinic. (Doc. 15-1 at 57). The notes in Plaintiff's chart states:

> The patient . . . lifted 40 to 50 pound cart at work back in mid to late February. He felt a pain and then subsequently noticed a bulge that he is able to push back in. The pain is slowly diminished but he still has quite a bit of difficulty in lifting anything heavy. He denies any GI complaints.

(*Id.*). Dr. Monajjem "wanted to operate on [Plaintiff] on [May] 3rd, but [h]e didn't think it would be enough time" to get Plaintiff's surgery approved for workers' compensation coverage. (*Id.* at 22-23). Accordingly, Dr. Monajjem scheduled Plaintiff for hernia surgery on May 10, 2011. (*Id.* at 21-22).

Plaintiff finally returned to work on May 3, 2011, where he was placed on lifting restrictions and was given light-duty assignments. (*Id.*; Doc. 15-1 at 21; Doc. 15-5 at 7). That day, Plaintiff met with Clark, as well as Human Resources Manager Janie Reed. (Doc. 15-1 at 24-25; Doc. 15-5 at 6-7). Reed confirmed that Dr. Monajjem was an approved surgeon for Plaintiff's surgery under the company's workers' compensation plan. (Doc. 15-1 at 24-25; Doc. 15-5 at 6-7). That same day, Reed reported Plaintiff's workers' compensation claim to the company's workers' compensation insurer, Travelers. (Doc. 13-3 at 2-3; Doc. 15-5 at 5).

---

[7] Defendants' records indicate that Plaintiff did not call in to work on April 29, 2011. (Doc. 15-2 at 136).

Also on May 3, 2011, Alexander sent an email to Ward recounting his conversations with Plaintiff about his February 17, 2011 injury and hernia, stating:

> [Plaintiff] told me that he did not do it here and that it was something that he didn't even need to necessarily have repaired. . . . [H]e said it was something he could have done some time ago and that it could have just started manifesting itself. I was concerned because he said hernia but I remember feeling at ease about it because I know he said that he didn't do it here and he was cleared to return to work. I felt at this point he was not a liability and the company was safe.

(Doc. 15-8 at 2). Ward advised Alexander that she would pass his comments along to Travelers for consideration in their workers' compensation investigation. (*Id.* at 1-2). On May 6, 2011, Reed emailed Vanessa Lewis, a Senior Claims Representative with Travelers, asking her to "confirm [Plaintiff] did or did not have a previous injury[.]" (*Id.* at 1). Lewis responded that same day, stating:

> I did talk with [Plaintiff] and asked if had made this statement to [Alexander]. He doesn't recall saying that it didn't happen here. He said he didn't think it would need any treatment as he didn't notice the swelling until the next day, and wasn't diagnosed as hernia until later.

(*Id.* at 1). Travelers' later determined that Plaintiff had suffered a compensable workers' compensation injury. (Doc. 13-3 at 2-3; Doc. 15-5 at 5).

Plaintiff underwent surgery on May 10, 2011 and returned to work on May 17, 2011 with job task restrictions. (*See* Doc. 15-9 at 1). Plaintiff had been pre-approved to take vacation time from May 23 to May 26, 2011 in order to attend his daughter's high school graduation. (Doc. 15-1 at 7-8, 41). According to Plaintiff, Camilletti advised him that it would be best if he did not take his vacation since he had missed several days of work. (Doc. 15-10 at 2). Plaintiff, however, went on his vacation as planned and returned to work on May 31, 2011. (Doc. 15-1 at 26-27). Plaintiff worked on restrictions on May 31, 2011, but returned to work without restrictions on June 1, 2011. (*Id.* at 26-

28). On June 14, 2011, Alexander completed Plaintiff's six-month performance review. (Doc. 15-6 at 5-6). Plaintiff was again rated as "effectively meets standards" for most categories, including attendance. (*Id.* at 5).

Sometime between June 1 and July 4, 2011, Plaintiff attended a meeting with Camilletti and Reed to discuss his absences since April 19, 2011. (Doc. 15-10 at 2). Plaintiff was told that his absences would be "split," with the ones after his surgery "falling under workers' comp" and the ones before his surgery "falling under [the Family Medical Leave Act]." (*Id.*). However, it was later determined that Plaintiff was not eligible for leave under the Family Medical Leave Act because he had not worked for the company for a full year. (Doc. 13-5 at 3; Doc. 15-1 at 30).

Plaintiff was absent from work on July 18, 2011 with "no reason given." (Doc. 15-2 at 136). Around this time, Distribution Specialist and attendance administrator Cindy Atkins performed a routine reporting of attendance information to provide to Human Resources. (Doc. 13-4 at 2-5; Doc. 16-2 at 2-3). The report showed Plaintiff's absences from April 19 through May 2, 2011, and an investigation into Plaintiff's absences commenced. (Doc. 13-4 at 2-5; Doc. 16-2 at 4-5). According to Ward, investigations into absences remain pending until a determination can be made as to whether or not the absence should be excused or counted towards the employee's attendance occurrence points. (Doc. 16-2 at 6).

At the end of July, Camilletti began asking Plaintiff to provide medical documentation to show that he was under a physician's care and unable to work during the time period from April 19 through May 2, 2011. (Doc. 15-2 at 5). Camilletti and Plaintiff discussed the need for him to provide medical documentation to excuse the absences on "a minimum of three" occasions between July and October of 2011. (*Id.*;

Doc. 15-1 at 33). Plaintiff attempted to get such documentation from Dr. Monajjem, but the doctor was unable to do so since he had not seen Plaintiff prior to May 2, 2011. (Doc. 15-1 at 34). Plaintiff was able to get Dr. Angles office to provide a letter confirming that he had seen Plaintiff on April 26, 2011. (*Id.*). However, this letter was not signed by Dr. Angles, did not state that Plaintiff had been under Angles' care, and did not excuse Plaintiff from work or state that he was unable to do his job either before or after the date of the office visit. (Doc. 15-2 at 6).

Around this time, Plaintiff was advised by Dr. Monajjem's office that they had not been paid for his surgery and that he would be billed directly for the associated expenses. (Doc. 15-1 at 35). Plaintiff offered to give Dr. Monajjem's office his workers' compensation case number. (*Id.*). Plaintiff later mentioned this exchange to Camilletti, who became "angry" and told Plaintiff that it was not his place to give out that information. (*Id.* at 35-36; Doc. 15-10 at 2).

On August 2, 2011, Plaintiff was again injured on the job, when a trash buggy collided with his leg. (Doc. 15-6 at 2-3). After Plaintiff advised Alexander about the injury, Alexander reported the injury to human resources. (*Id.*). It does not appear that Plaintiff left work early the day that he was injured. (*See* Doc. 15-2 at 136). The record indicates that Plaintiff did, however, leave work early on August 8, 2011 and called in sick the following day. (*Id.*).

On August 11, 2011, Alexander completed Plaintiff's nine-month performance review. (Doc. 15-6 at 7-8). Plaintiff was again rated as "effectively meets standards" in most categories, including attendance. (*Id.*). Plaintiff was then absent from work again on August 22 through 24, 2011. (*See* Doc. 16-4 at 1).

On August 25, 2011, Alexander prepared a "Second Corrective Action" for attendance policy violations. (Doc. 15-1 at 65). Alexander's comments on this notice state that Plaintiff had "still reached 4.5 absences which places [him] on a first corrective action. If [Plaintiff] has any more absences in the next year he will face further corrective action. . . . Going forward [Plaintiff] must use his attendance point[s] wisely." (*Id.*). Plaintiff signed the notice on August 26, 2011. (*Id.*).

On October 11, 2011, Camilletti advised Plaintiff that he was being suspended "pending investigation" of his file and attendance occurrence points because he had failed to provide proper medical documentation regarding his still unexcused absences in April and May. (*Id.* at 37; Doc. 15-2 at 12, 135; Doc. 16-2 at 5). Camilletti had asked Plaintiff "several times" in the months since their initial meeting why he was off from work in April and May. (Doc. 15-2 at 14). Plaintiff had responded that he "thought he might have been sick from his hernia" and expressed his belief that his constipation was "directly correlated" to, and was "another symptom of," his hernia. (*Id.* at 14; Doc. 13-1 at 32). However, Plaintiff never submitted any medical documentation "tying those days off [from April 19 through May 2, 2011] to his workers' comp hernia." (Doc. 15-2 at 14). Plaintiff has conceded that he did not have medical documentation to support his belief that his constipation was related to his hernia, and he "never asked a physician" to confirm his suspicions. (Doc. 13-1 at 33). Plaintiff instead indicated that his constipation was "never an issue" after his hernia surgery, and his belief that the two issues were related was "just common sense." (*Id.*).

For the next two days, Camilletti reviewed the documents that Plaintiff had provided, reviewed the dates that he had been absent, and calculated his total attendance occurrence points, including the dates that he was absent from April 19

through May 2, 2011. (Doc. 15-2 at 13). On October 13, 2011, Camilletti recommended that Plaintiff be terminated because he had an excessive level of attendance occurrence points.[8] (Doc. 15-7 at 1-2). Camilletti conceded that Plaintiff would not have been assigned attendance occurrence points for the absences in April and May of 2011 – and accordingly, would not have been terminated – if he had been out of work for a workers' compensation injury. (Doc. 15-2 at 2). Camilletti's termination recommendation was approved the same day. (Doc. 15-7 at 1-2). Camilletti called Plaintiff and asked him for the final time whether he had been able to find any documentation regarding his disputed absences. (*Id.*; Doc. 15-2 at 13-14). After Plaintiff told Camilletti that he did not have any additional information to provide regarding the absences, she informed him that he was being terminated. (Doc. 15-2 at 13-14; Doc. 15-7 at 1-2).

According to Camilletti, she made the decision to terminate Plaintiff "because of his absences on January 24, 2011; February 28, 2011; April 19, 20, 21, 25, 26, 27, 28, 29, 2011; July 18, 2011; and August 8, 9, 22, 23, 24, 2011." (Doc. 13-6 at 1). Camilletti averred that twelve employees, including Plaintiff, were terminated for violating Defendants' attendance policy "[f]rom 2009 to October 2011," and that Plaintiff was treated consistently with the other employees who were terminated for attendance policy violations. (Doc. 16-4 at 2). She stated that Plaintiff's workers' compensation claim "had nothing to do with [her] decision to terminate Plaintiff for failing to adhere to [Defendants'] attendance policy." (*Id.*). Plaintiff has conceded that he has "no proof"

---

[8] Camilletti originally believed that Plaintiff had 13.5 attendance occurrence points, but upon recalculation, she believed that he had 15.5 points. (*See* Doc. 15-2 at 135; Doc. 15-7 at 1-2). After Plaintiff was terminated, Camilletti recalculated Plaintiff's attendance occurrence points, and determined that Plaintiff had accrued only 13.5 points, as she originally believed. (Doc. 15-2 at 3-4). Camilletti stated that the method by which attendance points are "tallied" can "be kind of confusing." (*Id.* at 17-18). However, because Defendants' attendance policy calls for termination upon the accrual of only eight attendance occurrence points, Camilletti noted that the miscalculation "would not have changed the outcome." (*Id.*).

that Camilletti's decision to terminate him was motivated by his workers' compensation claim, but he contends that "it's more than a coincidence." (Doc. 13-1 at 34-35).

On November 21, 2011, Plaintiff initiated this action in state court. (Doc. 1-1). In his civil complaint, Plaintiff alleged that Defendants' unlawfully terminated his employment in retaliation for his filing of a claim for workers' compensation benefits, in violation of Tennessee law. (Doc. 1-1 at 7-8). On December 28, 2011, Defendants removed this action to federal court, pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441. (Doc. 1). Defendants now seek summary judgment. (*See* Docs. 37, 44).

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; rather, there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III.   ANALYSIS

Tennessee recognizes a common law cause of action for retaliatory discharge based on an employee's claim for workers' compensation benefits. *Anderson v. Std. Register Co.,* 857 S.W.2d 555, 556–59 (Tenn. 1993); *Reed v. Alamo Rent–a–Car, Inc.*, 4 S.W.3d 677, 684–85 (Tenn. Ct. App. 1999). This retaliatory discharge cause of action

provides "a narrow exception to the employment at will doctrine." *Abraham v. Cumberland–Swan, Inc.*, No. 01A01–9201CH00032, 1992 WL 207775, at *3–4 (Tenn. Ct. App. Aug. 28, 1992). The Tennessee Supreme Court "has cautioned that the exceptions to the employment-at-will doctrine should be narrowly applied and not permitted to consume or eliminate the general rule." *Yates v. Hertz Corp.*, 285 F. Supp. 2d 1104, 1111 (M.D. Tenn. 2003) (quoting *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 n.3 (Tenn. 1997)).

Under Tennessee common law, Plaintiff bears the burden of proving the following elements to establish a *prima facie* cause of action for retaliatory discharge based on a workers' compensation claim: (1) Plaintiff was employed by Defendants at the time of the alleged injury; (2) Plaintiff filed a claim for workers' compensation benefits against Defendants; (3) Defendants terminated Plaintiff; and (4) Plaintiff's claim for workers' compensation benefits was a substantial factor in Defendants' motivation to terminate Plaintiff's employment. *Anderson,* 857 S.W.2d at 558.

A plaintiff "cannot carry his burden by simply proving that he filed a worker's compensation claim that was followed by his termination. From these two facts standing alone, no inference of causation may be drawn." *Morris v. Columbia Constr. Co.*, 109 S.W.3d 314, 317 (Tenn. Ct. App. 2003); *Anderson*, 857 S.W.2d at 558-59 ("Proof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury."); *Reed*, 4 S.W.3d at 685 ("[T]he plaintiff must show that h[is] claim for workers' compensation benefits, as opposed to h[is] injury, was the true or substantial reason for h[is] discharge."). Thus, in order to meet the substantial factor requirement, "a plaintiff must show either direct or compelling circumstantial evidence of a causal connection between the workers'

compensation claim and the termination." *Crook v. Simpson Strong-Tie Co. Inc.*, Nos. 3:10-cv-445, 2:10-cv-99, 2:10-cv-100, 2012 WL 123988 at *10 (M.D. Tenn. January 17, 2012) (internal citations and quotations omitted). A plaintiff's circumstantial evidence may include "the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006). Temporal proximity between the claim and the termination is, in and of itself, insufficient to establish a causal link. *See Conatser v. Clarksville Coca–Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995) Likewise, a plaintiff's "subjective beliefs or speculations are insufficient to create the requisite causal relationship." *Id.*

If Plaintiff meets this initial burden, the burden then shifts to Defendants to articulate a legitimate, non-retaliatory reason for the termination. *Anderson*, 857 S.W.2d at 559. "If Defendants make such a showing the burden shifts back to Plaintiff to produce additional, compelling evidence of pretext by showing specific, admissible facts, which realistically challenge the defendant's stated reasons for its actions." *Thayer v. Tyson Foods, Inc.*, 355 F. App'x 886, 889-90 (6th Cir. 2009) (internal citations and quotations omitted). The terminated employee "must either provide direct evidence that a discriminatory reason more likely motivated the employer, or show indirectly that the employer's explanation is not credible." *Burke v. Wes Morgan Constr., Inc.*, No. 3:02-cv-1187, 2005 WL 2709638, at *8 (M.D. Tenn. Oct. 21, 2005).

Alternatively, the employee may establish pretext by "showing that the [employer's] reasons have no basis in fact, or if they have a basis in fact, by showing that they were not really factors motivating the discharge or, if they were factors, by showing that they were jointly insufficient to motivate the discharge." *Davis v. Reliance Elec.*, 104 S.W.3d 57, 63 (Tenn. Ct. App. 2002).

In the instant Motion, Defendants argue that Plaintiff has failed to demonstrate that his claim for workers' compensation benefits was a substantial factor in its decision to terminate his employment because (1) Plaintiff was treated consistently with other employees who violated the Company's attendance policy, and (2) Plaintiff has presented no proof that he was terminated for a retaliatory motive. (Doc. 13 at 9-10). In response, Plaintiff argues that he has compelling circumstantial evidence to establish a causal link between his workers' compensation claim and his termination, namely: (1) the five-month temporal proximity between his surgery and his termination; (2) his positive performance reviews before and after his disputed absences; and (3) Defendants' apparent disbelief that his injury was work-related and belief that he was "a liability." (Doc. 15 at 11-15).

The first three elements of the *prima facie* case are not in dispute in this case. Thus, in order to establish his *prima facie* case of retaliatory discharge for filing a workers' compensation claim, Plaintiff must prove that his claim for workers' compensation benefits was a substantial factor which motivated Defendants to terminate his employment. *See Anderson*, 857 S.W.2d at 558.

The facts in this case are essentially undisputed.[9]  Both parties agree that: (1) Plaintiff was injured at work in February 2011; (2) Plaintiff was absent from work from April 19 through May 2, 2011; (3) Plaintiff had surgery for a hernia in May 2011; (4) Defendants' immediately submitted a workers' compensation claim to their workers' compensation insurer, and Plaintiff's surgery was covered as a compensable injury under Defendants' workers' compensation insurance; (5) Plaintiff was given several months to provide Defendants' medical documentation excusing his absences from April 19 through May 2, 2011; (6) to date, Plaintiff has been unable to obtain medical documentation stating that he was unable to work on these days, or that his symptoms on these dates were related to his compensable workers' compensation injury; (7) Plaintiff missed additional, unexcused days of work both before April 19, 2011 and after returning to work from his hernia surgery; and (8) Defendants' employee handbook provides that employees will be subject to termination upon the accumulation of eight attendance occurrence points.

Based on these undisputed facts, and drawing all other reasonable inferences in Plaintiff's favor, the Court simply cannot find that Plaintiff has met his burden of establishing that his workers' compensation claim was a substantial factor in the decision to terminate his employment.  Plaintiff attempts to meet his burden by arguing that the five-month temporal proximity between his surgery and his termination, along

---

[9] Indeed, the primary dispute in this action is not a factual one; instead, the parties' main dispute is whether Defendants should have assessed Plaintiff with attendance occurrence points for his April and May absences.  It is undisputed that Defendants' written policy regarding medical documentation for certain absences, and that there is a complete absence of medical documentation indicating that Plaintiff was unable to work on the dates in question or that his absences were, in fact, directly correlated to Plaintiff's compensable workers' compensation injury.  While the reasonableness of Defendants' actions in applying this policy to Plaintiff under his unique circumstances may still be relevant to the issue of pretext, the Court does not believe that this issue is relevant to the analysis of whether Plaintiff's actual workers' compensation claim – rather than his injury – was a substantial factor motivating his termination.

with his positive performance reviews, both before and after the disputed absences, constitute "compelling circumstantial evidence" of causation between his workers' compensation claim and his termination. The undisputed evidence, however, demonstrates that, after Plaintiff's surgery, Defendants' welcomed him back to work, accommodated his work restrictions, and immediately processed his workers' compensation claim. The evidence also demonstrates that, after such time as an accounting was done of Plaintiff's absences, Defendants' attempted to work with Plaintiff over the course of several months to avoid having to asses him with attendance occurrence points for his April and May absences. Unfortunately for Plaintiff, he was unable to provide Defendants' with any medical documentation to support his subjective belief that his symptoms from April 19 through May 2, 2011 were attributable to his compensable workers' compensation injury or that he was unable to work during that time.

The Court finds that temporal proximity of Plaintiff's workers' compensation claim and ultimate termination in this case is not circumstantial evidence of a causal connection between the two events, especially in light of Defendants' efforts during the five-months following his workers' compensation claim to assist Plaintiff in having his absences excused. Likewise, Plaintiff's performance reviews in this case are not compelling circumstantial evidence of a causal connection between his claim for benefits and his discharge. "Sudden and marked changes" in an employee's evaluations following a workers' compensation claim may constitute circumstantial evidence that the employee's discharge was motivated by the claim; however, in this case, Plaintiff's performance reviews remained at their previous level – that is, mostly positive – following his claim for benefits. Indeed, the fact that Plaintiff's performance evaluations

remained positive, even in the area of attendance, after his absences and claim for benefits is entirely consistent with the undisputed evidence that Defendants' made a good-faith effort – after his claim for benefits was submitted – to give Plaintiff the benefit of that doubt regarding his unexcused absences.

Plaintiff also attempts to argue that certain emails sent by several individuals show that Defendants' had a negative attitude towards his injury. Plaintiff argues that the evidence shows that Defendants did not believe that his injury was work-related and believed that he was "a liability" to the company. Several of the emails cited by Plaintiff show that, during the course of Plaintiff's treatment and workers' compensation insurance investigation, certain people believed that Plaintiff's hernia may not have been related to his February 2011 workplace injury. However, Reed, Defendants' Human Resources Manager, simply forwarded this information to the workers' compensation insurance company for review, and asked them for an assessment of Plaintiff's injury. There is no evidence that any of Defendants' employees disputed Travelers' finding that Plaintiff's hernia was a compensable workers' compensation injury, that any other comments were made regarding Plaintiff's injury after he returned to work without restrictions, or that any of the individuals responsible for the decision to terminate Plaintiff for violating the attendance policy made any expression of doubt or negativity towards Plaintiff's injury.

Plaintiff has also failed to establish that Defendants' failed to adhere to company policy in terminating him. The evidence demonstrates that Plaintiff received the employee handbook, which clearly explains the attendance policy and the attendance occurrence point system and states that employees will be subject to termination for reaching eight attendance occurrence points. Although the Handbook lays out a

progressive discipline scheme that was not followed in Plaintiff's case, the Handbook expressly states that, while the steps "may" be used, the employer reserves the right to skip disciplinary steps "depending on the circumstances of each individual case." Thus, Defendants' failure to follow the progressive disciplinary scheme in Plaintiff's case does not demonstrate that Defendants' violated company policy in terminating Plaintiff without giving him numerous warnings.[10] The Handbook also provides that employees are required to provide medical documentation for certain absences and that the employer reserves the right to reject documentation that is inadequate to excuse the employee from work. In fact, the Handbook provides that such information must be provided within 24 hours of the employee's return to work. Thus, to the extent that Defendants' deviated from their policy in Plaintiff's case, they did so to Plaintiff's benefit – that is, to provide him with additional time to have his absences excused. Moreover, Plaintiff has not presented any evidence that he was subject to discriminatory treatment as compared to other similarly situated employees. Plaintiff has not identified any similarly situated employees that were not terminated for violating the attendance policy, nor has he presented evidence to refute Camilletti's testimony that all of the employees who were terminated for violating the attendance policy for at least two years preceding Plaintiff's termination were treated consistently.

Simply put, all that Plaintiff has established is that he submitted a workers' compensation claim in May 2011 and that he was terminated in October 2011. He has failed to present any evidence – other than his own subjective belief that he was subject to retaliatory discharge – that would establish a causal relationship between his claim

---

[10] Arguably, however, Plaintiff received more "warnings" regarding his attendance occurrence points than are required by the Handbook. The undisputed evidence demonstrates that Plaintiff received on written warning regarding his attendance from Alexander and discussed the need to excuse his April and May 2011 absences with Camilletti on at least three occasions from June through October of 2011.

for benefits and his termination.  *See Conatser*, 920 S.W.2d at 648; *Morris*, 109 S.W.3d at 317; *Reed*, 4 S.W.3d at 685.  The Court accordingly finds that he has failed to show that his workers' compensation claim was a "substantial factor" that motivated his termination, and thus, that he has failed to make a *prima facie* case of workers' compensation retaliatory discharge under Tennessee common law.[11]  *See Anderson*, 857 S.W.2d at 558.  Accordingly, Defendants' are entitled to judgment as a matter of law.

For the aforementioned reasons, Plaintiff's Motion for Leave to Respond (Doc. 17) is hereby **DENIED**.  Defendants' Motion for Summary Judgment (Doc. 12) is hereby **GRANTED**.  The parties' Joint Motion to Continue Trial (Doc. 20) is hereby **DENIED AS MOOT**.

A separate judgment will enter.  The Clerk is **DIRECTED** to close the file in this case.

**SO ORDERED** this 27th day of December, 2012.

___/s/___*Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE

---

[11] Because the Court finds that Plaintiff has failed to establish a *prima facie* case of retaliatory discharge, the Court need not address the parties' arguments as to whether Plaintiff can establish that the stated reason for his discharge – violation of Defendants' attendance policy – was pretextual.  However, the Court notes that, even assuming that Plaintiff had met his burden as to the *prima facie* case, the Court would find that Plaintiff failed to present any "additional, compelling evidence . . . showing specific, admissible facts, which realistically challenge[d] the defendant[s'] states reasons" for Plaintiff's termination.  *See Thayer*, 355 F. App'x at 889-90.